# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GILBERT MARROQUIN, as successor in interest to Agapita Marroquin,** | **CASE NO. 1:18-CV-0974 AWI SAB** |
| **Plaintiff** | **ORDER ON DEFENDANTS' MOTION TO DISMISS** |
| **v.** | |
| **PFIZER, INC., MYLAN INSTITUTIONAL INC., and DOES 2-25,** | (Doc. Nos. 18, 19) |
| **Defendants** | |

The case stems from the death of Agapita Marroquin after she had taken the generic prescription drug amiodarone. Plaintiff Gilbert Marroquin, Mrs. Marroquin's husband, brings seven claims under California law against Defendants Pfizer, Inc. ("Pfizer") and Mylan Institutional, Inc. ("Mylan") for strict products liability, negligence based products liability, breach of warranty, intentional misrepresentation, negligent misrepresentation, and concealment. The active complaint is the First Amended Complaint ("FAC"). Both defendants have filed a Rule 12(b)(6) motion to dismiss. For the reasons that follow, Defendants' motions will be granted.

## RULE 12(b)(6) FRAMEWORK

Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. See Mollett v. Netflix, Inc., 795 F.3d 1062, 1065 (9th Cir. 2015). In reviewing a complaint under Rule 12(b)(6), all well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. Kwan v. SanMedica, Int'l, 854 F.3d 1088, 1096 (9th Cir. 2017). However,

complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Johnson v. Federal Home Loan Mortg. Corp., 793 F.3d 1005, 1008 (9th Cir. 2015). The Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir. 2013). To avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678; Mollett, 795 F.3d at 1065. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). "Plausibility" means "more than a sheer possibility," but less than a probability, and facts that are "merely consistent" with liability fall short of "plausibility." Iqbal, 556 U.S. at 678; Somers, 729 F.3d at 960. The Ninth Circuit has distilled the following principles for Rule 12(b)(6) motions: (1) to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively; (2) the factual allegations that are taken as true must plausibly suggest entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation. Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014). In assessing a motion to dismiss, courts may consider documents attached to the complaint, documents incorporated by reference in the complaint, or matters subject to judicial notice. In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1051 (9th Cir. 2014). If a motion to dismiss is granted, "[the] district court should grant leave to amend even if no request to amend the pleading was made . . . ." Ebner v. Fresh, Inc., 838 F.3d 958, 962 (9th Cir. 2016). However, leave to amend need not be granted if amendment would be futile or the plaintiff has failed to cure deficiencies despite repeated opportunities. Garmon v. County of L.A., 828 F.3d 837, 842 (9th Cir. 2016).

From the Complaint, on April 15, 2016, through April 28, 2016, amiodarone[1] was administered orally and intravenously to Mrs. Marroquin at Kaweah Delta Medical Center. However, the amiodarone caused pulmonary disease and her resulting death on May 6, 2016. Amiodarone is listed as a cause of death on Mrs. Marroquin's death certificate. The admiodarone administered to Mrs. Marroquin was manufactured and distributed by Pfizer and Mylan.

Marroquin alleges that: (1) the amiodarone was defective at the time it left Defendants' control; (2) Defendants breached their duty of care regarding preparation, design, research, development, manufacture, inspection, labeling, market, promotion, and sale of amiodarone; (3) Defendants' breached the warranty of suitability/fitness with respect to amiodarone; (4) Defendants failed to adequately warn of amiodarone's potential risks; (5) Defendants intentionally or negligently misrepresented that amiodarone was safe, fit, and effective for human use; and (6) Defendants concealed the fact that amiodarone was not safe, fit, or effective for human use.

## I.    PFIZER'S MOTION

### *Defendant's Arguments*

Pfizer argues that the FDA approved label for amiodarone/Cordarone clearly warns of the risks and dangers of developing pulmonary toxicity and that pulmonary toxicity was fatal 10% of the time. In fact, pulmonary toxicity is identified 15 times in the drug label. Each of FAC's claims depend on a finding that the warning label was inadequate. Because the warning label is clear and adequate, no recovery is possible. By operation of California's learned intermediary doctrine, this is true even if Mrs. Marroquin did not read any part of the warning label.

Alternatively, Pfizer argues that the FAC fails to meet any of the applicable pleading requirements. First, the FAC's claims of concealment and negligent and intentional misrepresentation fail to comply with Rule 9(b). The FAC lumps defendants together and makes only conclusory allegations that do not identify the who, what, when, where, and how of any

---

[1] Amiodarone is the generic name for the prescription drug Cordarone. The FDA approved Cordarone "as a drug of last resort for patients suffering from ventricular fibrillation and ventricular tachycardia, both life-threatening heartbeat irregularities." McDaniel v. Upsher-Smith Labs., 893 F.3d 941, 943 (6th Cir. 2018).

"fraudulent" conduct. Second, the first cause of action for "strict products liability" does not differentiate between a design defect and a manufacturing defect. However, California law does not recognize a design defect claim with respect to pharmaceutical products, and the manufacturing defect claim does not explain how the manufacturing process deviated from the intended outcome. Third, because the FAC's negligence claim is congruent with first claim for products liability except for an added element of causation, the negligence claim fails for the same reasons as the products liability claim. Fourth, the failure to warn products liability claim fails because the FAC fails to identify any danger about which no warning was given, nor does the FAC allege that any failure to warn was the cause of Mrs. Marroquin's death. Fifth, the FAC fails to allege the terms of any warranty, or that Mrs. Marroquin or her physician relied on any terms of a warranty. Further, any implied warranty theory fails because Mrs. Marroquin relied on the skill and judgment of her physician. Finally, the request for punitive damages fails because no factual allegations suggest oppressive, fraudulent, or malicious conduct.

### *Plaintiff's Opposition*

Marroquin argues that not all of his claims are based on a failure to warn, and, under Rule 8, he need not prove anything, rather he need only plead plausible claims. Marroquin also argues that the FAC is adequately pled in general. First, the strict products liability contains allegations that track Judicial Council of California, Civil Jury Instruction (CACI) 1201, manufacturing defect.

Second, Marroquin states that he agrees that he must prove the four elements of negligence, plus the element that the product defect was due to defendants' negligence. However, the FAC does allege that Pfizer breach its duty to Ms. Marroquin, which caused her health. If the Court finds the allegations incomplete, additional facts may be alleged.

Third, the "exact terms" of a warranty do not need to be alleged. Although the FAC adequately alleges breaches of both express and implied warranties, additional allegations regarding Pfizer's advertising to the public that its product was safe, fit, and effective could be made.

Fourth, a strict liability failure to warn claim has been properly pled. The adequacy of a warning is generally a fact question, it is unknown whether the label proffered by Pfizer is the same label provided on the relevant batch of amiodarone that was administered in this case. These are fact questions that prevent dismissal at this stage.

Fifth, Marroquin agrees that additional allegations are necessary to allege a plausible intentional misrepresentation claim.

Sixth, there is a growing trend among the district courts within the Ninth Circuit that negligent misrepresentation claims need not comply with Rule 9(b). Because the FAC allegations that Pfizer misrepresented that Amiodarone was safe, fit, and effective, a plausible claim has been stated.

Seventh, Pfizer's arguments are not clear. The FAC alleges that Pfizer concealed that amiodarone was not safe, fit, or effective for human use and that it had a serious propensity to cause injury or death. These are sufficient facts.

Finally, the punitive damages claim is based only on the fifth and seventh claims for intentional misrepresentation and concealment. The specific facts alleged under those claims are sufficient to support punitive damages.

*Discussion*

Initially, Pfizer's argument that each of Marroquin's claims involves the adequacy of warnings is not persuasive. As discussed below, the FAC alleges a manufacturing defect claim. The adequacy of any warnings will not defeat a manufacturing defect claim against a drug manufacturer. See Brown v. Superior Ct., 44 Cal.3d 1049, 1069 & n.12 (1988); Trejo v. Johnson & Johnson, 13 Cal.App.5th 110, 144 (2017); Garrett v. Howmedica Oseonics Corp., 214 Cal.App.4th 173, 183 (2013). Therefore, the Court will evaluate whether the FAC's allegations meet Rule 8 and Rule 9(b) standards.

1.      1st Cause of Action – "Strict Products Liability"

The FAC does not expressly allege what type of products liability theory is intended. However, Marroquin's opposition references the CACI 1201 jury instruction, which sets the elements for a manufacturing defect claim. Given this clarification, the Court will read the first

cause of action as limited to a manufacturing defect claim.[2]

A drug manufacturer may be held strictly liable for a manufacturing defect in its prescription drug.  <u>See</u> <u>Brown</u>, 44 Cal.3d 1049, 1069 n.12 (1988); <u>Trejo</u>, 13 Cal.App.5th at 144; <u>Garrett</u>, 214 Cal.App.4th at 183.  Generally, a "manufacturing or production defect is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line."  <u>Barker v. Lull Engineering Co</u>, 20 Cal.3d 413, 429 (1978); <u>In re Coordinated Latex Glove Litigation</u>, 99 Cal. App. 4th 594, 605 (2002).  The "manufacturing defect" theory posits that "a suitable design is in place, but that the manufacturing process has in some way deviated from that design."  <u>In re Coordinated Latex</u>, 99 Cal.App.4th at 613.  That is, "the product does not conform to the manufacturer's design."  <u>Garrett</u>, 214 Cal.App.4th at 190.  A plaintiff pursuing a manufacturing defect claim must *inter alia* identify/explain how the product either deviated from the manufacturer's intended result/design or how the product deviated from other seemingly identical models; a bare allegation that the product had "a manufacturing defect" is an insufficient legal conclusion.  <u>Lucas v. City of Visalia</u>, 726 F.Supp.2d 1149, 1155 (E.D. Cal. 2010); <u>see also</u> <u>Barker</u>, 20 Cal.3d at 429.

Here, the FAC alleges that the defendants manufactured amiodarone, the defendants knew that amiodarone "was defective at the time [it left defendants' control]," that Mrs. Marroquin took amiodarone over a period of several days, and shortly thereafter developed a lung condition that led to her death.  <u>See</u> FAC ¶ 12-15.  What is absent are any allegations that actually describe a manufacturing defect.  Simply alleging that the amiodarone is "defective" is a bare legal conclusion that is insufficient for purposes of *Iqbal*.  Because the FAC fails to identify or explain how the amiodarone either deviated from the manufacturer's intended result/design or how the amiodarone deviated from other seemingly identical "units" of amiodarone, no plausible claim is stated and dismissal is appropriate.  <u>Lucas</u>, 726 F.Supp.2d at 1155.

---

[2] There are three possible strict products liability theories:  design defect, manufacturing defect, and warning defect.  <u>See</u> <u>Webb v. Special Electric Co. Inc.</u>, 63 Cal.4th 167, 180 (2016).  Reading the first cause of action as being limited to a manufacturing defect is appropriate because the fourth cause of action alleges a strict liability failure to warn claim, and a design defect claim is not possible.  "[A] manufacturer of prescription drugs is exempt from strict liability for defects in design . . . ."  <u>Anderson v. Owens-Corning Fiberglas Corp.</u>, 53 Cal.3d 987, 995 (1991) (describing <u>Brown v. Superior Ct.</u>, 44 Cal.3d 1049, 1069 (1988)); <u>Garrett v. Howmedica Oseonics Corp.</u>, 214 Cal.App.4th 173, 182 (2013).

2.       <u>Fourth Cause of Action – Strict Liability – Failure to Warn</u>

Because a manufacturer generally has a duty to warn consumers about the hazards of its product, a product may be dangerous because it lacks adequate warnings or instructions. <u>Webb v. Special Electric Co. Inc.</u>, 63 Cal.4th 167, 180-81 (2016). Manufacturers are strictly liable for injuries caused by their failure to provide adequate warnings of known or reasonably scientifically knowable dangers at the time they manufactured and distributed their product. <u>Johnson v. American Standard, Inc.</u>, 43 Cal.4th 56, 64 (2008); <u>Carlin v. Superior Ct.</u>, 13 Cal.4th 1104, 1108-09, 1112 (1996). A plausible claim for a failure to warn should include allegations that *inter alia* identify which danger was not warned against, explain that the danger was substantial, and that the danger was known or reasonably knowable, or explain how any warning that was given was inadequate. <u>Lucas</u>, 726 F.Supp.2d at 1156 n.1; <u>Altman v. HO Sports Co.</u>, 2009 U.S. Dist. LEXIS 108971, *23-*25 (E.D. Cal. Nov. 19, 2009); <u>Johnson</u>, 43 Cal.4th at 64-67; <u>Wright v. Stang Mfg. Co.</u>, 54 Cal.App.4th 1218, 1230 (1997). However, "in the case of prescription drugs, the duty to warn runs to the physician, not the patient." <u>Carlin</u>, 13 Cal.4th at 1116; <u>see</u> <u>T.H. v. Novartis Pharmaceuticals Corp.</u>, 4 Cal.5th 145, 164 (2017); <u>Bigler-Engler v. Breg, Inc.</u>, 7 Cal.App.5th 276, 319 (2017). "If adequate warning of potential dangers of a drug has been given to doctors, there is no need by the drug manufacturer to insure that the warning reaches the doctor's patient for whom the drug is prescribed." <u>Stevens v. Parke, Davis & Co</u>, 9 Cal.3d 51, 65 (1973); <u>Bigler-Engler</u>, 7 Cal.App.5th at 319. Physicians typically rely on a prescription drug's warning label. <u>T.H. v. Novartis Pharmaceuticals Corp.</u>, 4 Cal.5th 145, 178 (2017). "Whether the warning is adequate is usually a question of fact." <u>Schwoerer v. Union Oil Co.</u>, 14 Cal.App.4th 103, 112 (1993). Finally, the failure to warn must be a substantial factor in causing the plaintiff's harm. <u>See</u> <u>Ramos v. Brenntag Specialties, Inc.</u>, 63 Cal.4th 500, 509 (2016); <u>Huitt v. Southern Cal. Gas Co.</u>, 188 Cal.App.4th 1586, 1604 (2010).

Here, there are several problems with the fourth cause of action. First, the FAC alleges that there were potential risks known regarding the use of amiodarone, but Defendants "failed to adequately warn of the potential risks." FAC ¶¶ 37, 38. Given that Mrs. Marroquin developed a fatal lung condition from amiodarone, the Court will assume that the "potential risks" refer to the

risks of developing various lung and respiratory problems, some of which may be fatal.  However, there are no allegations that explain how or why the warnings provided were inadequate.  There are several ways in which a warning may be inadequate.  E.g. Stevens, 9 Cal.3d at 66-67 (holding that a warning may have been watered down by overpromotion or that other forms of the warning were not sufficiently effective at reaching a prescribing physician); Wright, 54 Cal.App.4th at 1236 (finding a triable issue of fact because no warning was given); Huynh v. Ingersoll-Rand, 16 Cal.App.4th 825, 834 (1993) (finding a triable issue of fact where warning could be seen as too vague or ambiguous); Burke v. Almaden Vineyards, Inc., 86 Cal.App.4th 768, 772 (1978) (recognizing that strict liability may attach "if a *conspicuous* warning is not given") (emphasis added).  Merely stating that the Defendants failed to "adequately warn" of potentially fatal lung conditions is a bare legal conclusion.

Second, the FAC alleges that Mrs. Marroquin died as a result of amiodarone.  See FAC ¶ 42.  However, for a failure to warn claim, the inadequate warning must be a substantial factor in causing harm.  See Ramos, 63 Cal.4th at 509; Huitt, 188 Cal.App.4th at 1604.  The FAC fails to allege the inadequate warning was a substantial factor in causing Mrs. Marroquin's death.

Third, the FAC alleges that "ordinary consumers" would not have recognized the potential risks of the amiodarone.  FAC ¶ 39.  However, as indicated above, because amiodarone is a prescription drug, the duty to warn runs to physicians, not to patients.  Use of the term "ordinary consumer," without reference to or recognition of the fact that a physician is the person to be warned, improperly suggests that the adequacy of a warning will be determined by reference to the ordinary consuming public in general and not to a physician.  Cf. CACI 1205 (including bracketed language to be used in prescription drug cases that states, "The warning must be given to the prescribing physician . . . .").

Fourth, Pfizer has submitted a copy of the FDA approved Cordarone label for 2015 that was in effect at the time Mrs. Marroquin was administered amiodarone.  See Doc. No. 19-2.[3]

---

[3] Marroquin does not object to consideration of the FDA approved Cordarone label, nor does Marroquin contend that the document submitted by Pfizer is inaccurate.  Therefore, the Court finds that taking judicial notice of the FDA approved label for Cordarone is appropriate.  See Fed. R. Evid. 201(b)(2) (court may take judicial notice of a fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); Chandler v. Janssen Pharms., Inc., 332 F.Supp.3d 314, 324 (E.D. N.Y. 2018).

Under the "Indications and Usage" section, the Cordarone label reads:[4] "Because of life-threatening side effects and the substantial difficulties associated with its use (see "**WARNINGS**" below), Cordarone is indicated only for the treatment of the following documented, life-threatening recurrent ventricular arrhythmias when these have not responded to documented adequate doses of other available antiarrhythmics or when alternative agents could not be tolerated. 1. Recurrent ventricular fibrillation. 2. Recurrent hemodynamically unstable ventricular tachychardia. As is the case for other antiarrhythmic agents, there is no evidence from controlled trials that the use of Cordarone tables favorably affects survival." Id. at p.5. Under the "Warnings" section, the label states in part:

> Cordarone is intended for use only in patients with the indicated life-threatening arrhythmias because its use is accompanied by substantial toxicity.
>
> Cordarone has several potentially fatal toxicities, the most important of which is pulmonary toxicity (hypersensitivity pneumonitis/alveolar pneumonitis) that has resulted in clinically manifest disease at rates as high as 10 to 17% in some series of patients with ventricular arrhythmias given doses around 400 mg/day, and as a abnormal diffusion capacity without symptoms in a much higher percentage of patients. Pulmonary toxicity has been fatal about 10% of the time.

Id. at p.6. The warning section also contains nearly two pages of warnings relating exclusively to "Pulmonary Toxicity." Under the "Adverse Reactions" section, the label states that the "most serious reactions are pulmonary toxicity . . . ." Id. at p.17. Finally, in the "Medication Guide" portion of the label, the first thing that patients are informed is that "Cordarone can cause serious side effects that can lead to death including: lung problems . . . ." Id. at p.22.

Citing *Schwoerer*, Marroquin states that the adequacy of a warning is generally a fact question. The Court agrees, but this does not mean that adequacy is *always* a question of fact for a jury. Marroquin does not actually address the adequacy of the warnings described above. As quoted above, the FDA label clearly states that Cordarone is approved to treat two serious heart conditions and it is a drug of last resort because of its potentially fatal toxicities. More than once, pulmonary toxicity is clearly and expressly identified as the most dangerous toxicity/potential side effect. Percentages of those who experience pulmonary toxicity and the percentage of those who

---

[4] By federal law, the warning label for amiodarone must be identical to the warning label for Cordarone. See PLIVA, Inc. v. Mensing, 564 U.S. 604, 613 (2011).

suffer fatal pulmonary toxicity is provided. Importantly, there is nearly two pages of warnings/information devoted entirely to pulmonary toxicity. These warnings are clear, do not appear to be inconspicuous, and appear to warn of the exact danger that tragically befell Mrs. Marroquin. Without elucidation from Marroquin, the warning is adequate. Cf. Utts v. Bristol-Myers Squibb Co., 251 F.Supp.3d 655, 673-74 (S.D. N.Y. 2017) (applying California law and finding that a drug label's warnings were adequate as a matter of law); Kearl v. Lederle Labs, 172 Cal.App.3d 812, 834 (1985) (finding warning on a vaccine was adequate).

Marroquin states that it is unknown whether the label quoted above was the same label on the batch of amiodarone administered in this case, and that neither party can presently confirm the existence of the label. It is unclear precisely what Marroquin means by this argument. To the extent that Marroquin relies on his wife reading or receiving any warnings or labels, that is irrelevant. The duty to warn does not run to Mrs. Marroquin, it runs to her prescribing physician. See Carlin, 13 Cal.4th at 1116; Bigler-Engler, 7 Cal.App.5th at 319. If Marroquin means that the prescribing physician was not given the label or did not review the label at the time he prescribed amiodarone, that does not mean that the warning was inadequate (nor does it necessarily mean that the prescribing physician was unaware of the danger of pulmonary toxicity). The Court is unaware of any authority that holds a warning is inadequate simply because a person or physician failed to read the warning. Cf. Altman v. HO Sports Co., 821 F.Supp.2d 1178, 1188 (E.D. Cal. 2011) ("Generally, when a warning is given, but the person to whom the warning is directed does not read the warning, there is no causation."). If Marroquin means that a different label was reviewed by the physician, then he may have a valid claim. However, Marroquin states that neither party can presently confirm the existence of the label. This indicates that Marroquin is simply theorizing that a different label or warning might have been reviewed by the prescribing physician. If Marroquin has reason to believe that the prescribing physician reviewed and relied on a label that was materially different from the 2015 label described above, he needs to expressly make such an allegation.[5] Without an allegation that the label was different from the 2015 box

---

[5] It seems highly unlikely that the physician would have read a label materially different from the 2015 label. As part of Pfizer's reply, it submitted copies of the FDA approved Cordarone box label for the years 1985, 2010, 2011, and 2014. See Doc. Nos. 26-1 to 26-6. The Court takes judicial notice of these labels. See Fed. R. Evid. 201(b)(2).

label, discovery on the subject would not be appropriate. See Iqbal, 556 U.S. at 678-79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); Mujica v. AirScan, Inc., 771 F.3d 580, 593 (9th Cir. 2014) ("The Supreme Court has stated [in *Iqbal*] that plaintiffs must satisfy the pleading requirements of Rule 8 *before* the discovery stage, not after it.") (emphasis in original).

For these reasons, no plausible claim is stated and dismissal is appropriate.

### 3.     Second Cause of Action – Negligence Products Liability

"[U]nder either a negligence or a strict liability theory of products liability, to recover from a manufacturer, a plaintiff must prove that a defect caused the injury." Merrill v. Navegar, Inc., 26 Cal.4th 465, 479 (2001); Trejo, 13 Cal.App.5th at 125. Under a negligence theory, in addition to proving that a defect caused the injury, the plaintiff must prove the "additional element" that the "defect in the product was due to negligence of the defendant." Merrill, 26 Cal.4th at 479; Trejo, 13 Cal.App.5th at 125; see also Carlin, 13 Cal.4th at 1112 (discussing failure to warn).

Here, the FAC alleges that the Defendants did not comply with existing standards of care in their preparation, design, research, development, manufacture, inspection, labeling, marketing, promotion, and sale of amiodarone, including a duty to ensure that users would not suffer from unreasonable, dangerous, or untoward side effects. See FAC ¶ 21. However, the FAC fails to identify a product defect with the amiodarone. The same analysis regarding the deficiencies of the strict liability causes of action apply, at least to defects in warning and manufacture. If a manufacturing defect is at issue, Marroquin must explain how the amiodarone differed from Defendants' intended design or how it was different from other batches of amiodarone. If a warning defect is at issue, Marroquin must explain how the warning was inadequate, keeping in mind that the duty to warn runs to the physician and that the FDA approved label appears adequate. If a design defect is at issue, Marroquin must identify what aspect of amiodarone makes it defective.[6] Without factual allegations that identify a product defect, and allege that the defect

---

[6] Defendants cannot be liable under a strict liability design defect. See Brown, 44 Cal.3d at 1069. However, it is possible to pursue a claim of negligent design defect against Defendants. See id. at 1069 n.12; Scott v. C.R. Bard, Inc., 231 Cal.App.4th 763, 772-74 (2014).

resulted from Defendants' negligence, no plausible claim is stated.  Therefore, dismissal of this cause of action is appropriate.

4. <u>Third Cause of Action – Breach of Warranty</u>[7]

"An implied warranty of fitness for a particular purpose arises only where (1) the purchaser at the time of contracting intends to use the goods for a particular purpose, (2) the seller at the time of contracting has reason to know of this particular purpose, (3) the buyer relies on the seller's skill or judgment to select or furnish goods suitable for the particular purpose, and (4) the seller at the time of contracting has reason to know that the buyer is relying on such skill and judgment." <u>Keith v. Buchanan</u>, 173 Cal.App.3d 13, 25 (1985).  Reliance by the plaintiff upon the skill and judgment of the defendant to select a product that is suitable for the plaintiff's needs is the "major question" for an implied warranty of fitness claim.  <u>Id.</u>  However, in a context of prescription drugs, "a patient's expectations regarding the effects of a prescription drug are those related to him by his physician, to whom the manufacturer directs the warnings regarding the drug's properties." <u>Carlin</u>, 13 Cal.4th at 1118 (quoting <u>Brown</u>, 44 Cal.3d at 1061-62).  For breach of warranty claims, "ordinarily it is the prescribing doctor who in reality stands in the shoes of the ordinary consumer." <u>Carlin</u>, 13 Cal.4th at 1118.  "[B]reach of express or implied warranty claims . . . may not be maintained against a manufacturer of prescription drugs who has properly prepared the product and marketed it with warnings of known or knowable dangers." <u>Hufft v. Horowitz</u>, 4 Cal.App.4th 8, 24 (1992) (citing <u>Brown</u>, 44 Cal.3d at 1072).

Here, the FAC essentially tracks the CACI 1232 instruction.  However, the particular purpose for which Mrs. Marroquin obtained the amiodarone is not identified.  To give adequate notice and to state a plausible claim for an implied warranty of fitness claim, the intended or particular purpose of the warranted product must be identified.  <u>Cf.</u> <u>American Suzuki Motor Corp. v. Superior Ct.</u>, 37 Cal.App.4th 1291, 1295 n.2 (1996) (noting that a "particular purpose . . . envisages a specific use by the buyer which is peculiar to the nature of his business . . . .").

---

[7] Pfizer argues that it is unclear whether Marroquin is alleging a breach of express warranty or an implied warranty. The allegations track the essential elements of a claim for breach of the implied warranty of fitness for a particular purpose.  <u>Cf.</u> FAC ¶¶ 27-33 <u>with</u> CACI § 1232.  Therefore, the Court will only read the third cause of action as alleging a claim for breach of the implied warranty of fitness.

Additionally, the duty to warn about a prescription drug run to the physician, and information conveyed for purposes of a breach of warranty claim, are viewed with respect to the prescribing physician. See Carlin, 13 Cal.4th at 1118; Brown, 44 Cal.3d at 1061-62, 1072; Hufft, 4 Cal.App.4th at 24. There are no allegations that describe what information/representation from Pfizer or Mylan that Mrs. Marroquin's physician considered when he or she decided to administer amiodarone. However, the fatal lung condition that Mrs. Marroquin developed is clearly identified and warned against in the FDA approved label for Cordarone. Cf. Hufft, 4 Cal.App.4th at 24. As discussed above, Marroquin does not describe how the warnings provided in the Cordarone label were inadequate.

Finally, to the extent that Mrs. Marroquin's reliance (as opposed to her physician's reliance) is relevant, the FAC alleges that Mrs. Marroquin relied on Defendants' skill and judgment regarding amiodarone and that Defendants had reason to know that Mrs. Marroquin was relying on their skill and judgment. See FAC ¶¶ 28, 29. Amiodarone is not an over the counter medication, it is a prescription drug. Without a prescription from a physician, Mrs. Marroquin would not have been administered amiodarone at Kaweah Delta Medical Center. The Court agrees with Pfizer that these facts create the reasonable inference that Mrs. Marroquin relied on the experience and skill of her physicians to administer amiodarone. The FAC does not describe the circumstances under which the amiodarone was prescribed, and there are no factual allegations that reasonably suggest that she did not rely on the judgment of her physicians. The factual allegations do not plausibly indicate that Mrs. Marroquin relied on anything other than her physician's judgment. Cf. Carlin, 13 Cal.4th at 1118 (discussing breach of warranty claims against drug manufacturers); Keith, 173 Cal.App.3d at 25 (noting that reliance on the manufacturer's skill is critical to a warranty of fitness claim).

For these reasons, no plausible claim is stated and dismissal is appropriate.

5.    Fifth, Sixth, & Seventh Causes of Action  - Intentional Misrepresentation

"The elements of a cause of action for intentional misrepresentation are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) actual and justifiable reliance, and (5) resulting damage." Daniels v.

13

_Select Portfolio Servicing, Inc._, 246 Cal.App.4th 1150, 1166 (2016).  The elements of a claim for negligent misrepresentation are:  "(1) a misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) ignorance of the truth and justifiable reliance thereon by the party to whom the misrepresentation was directed, and (5) damages."  _Fox v. Pollack_, 181 Cal. App.3d 954, 962 (1986); _see also_ _Daniels_, 246 Cal.App.4th at 1166.  The elements of fraudulent concealment are:  "(1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact."  _Hambrick v. Healthcare Partners Med. Grp., Inc._, 238 Cal. App. 4th 124, 162 (2015).  Because each of these causes of action sound in fraud, a plaintiff must meet the pleading requirements of Federal Rule of Civil Procedure 9(b).  _See_ _Monreal v. GMAC Mortg., LLC_, 948 F.Supp.2d 1069, 1077-78 (S.D. Cal. 2013); _United States ex rel. Ruhe v. Masimo Corp._, 929 F.Supp.2d 1033, 1036 (C.D. Cal. 2012); _Das v. WMC Mortg. Corp._, 831 F.Supp.2d 1147, 1166 (N.D. Cal. 2011).

To plead fraud with the particularity required by Rule 9(b), a complaint "must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false."  _Davidson v. Kimberly-Clark Corp._, 889 F.3d 956, 964 (9th Cir. 2018).  "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud."  _United States v. United Healthcare Ins. Co._, 848 F.3d 1161, 1184 (9th Cir. 2016).  Additionally, when the defendant is an entity, a complaint generally must also identify the person who made the false representations on behalf of the entity.  _See_ _United States ex. Lee v. SmithKline Beecham_, 245 F.3d 1048, 1051 (9th Cir. 2001); _White v. J.P. Morgan Chase, Inc._, 167 F.Supp.3d 1108, 1115 (E.D. Cal. 2018); _Griffin v. Lending Tree Servicing, LLC_, 166 F.Supp.3d 1030, 1057-58 (C.D. Cal. 2015).

Here, the three claims are based on representations that amiodarone is "safe, fit, and effective for human use." See FAC ¶¶ 46, 56, 66. These claims allege that such a representation is false, or that the Defendants concealed the fact that amiodarone was not safe, fit, and effective, and that Mrs. Marroquin relied on Defendants' representations or Mrs. Marroquin was unaware of the concealed fact. See id. at ¶¶ 48, 50, 58, 60, 67.

Marroquin concedes that his claim for intentional misrepresentation does not meet the Rule 9(b) "who, what, when, where, and how" test. That concession should apply equally to his claims of negligent misrepresentation and concealment, as all three claims share the same deficiencies.[8] Each of the claims improperly lumps the two Defendants together without differentiating the individual conduct, the identities of any individual who made the representations are not alleged, when the misrepresentations were made is not alleged,[9] how the misrepresentations were made is not alleged, and where the misrepresentations occurred is not alleged.

The FAC does identify the "what" of the misrepresentations, that amiodarone was "safe, fit, and effective." However, the Court has serious concerns over the plausibility of this allegation. Pfizer has presented documentation that Cordarone has been approved by the FDA as a drug of last resort for two types of serious heart arrhythmias since 1985. See Doc. No. 26-2. From the FDA approved warning label in 1985 to the current 2015 warning label, lung toxicity and the statistics regarding those who develop lung toxicity have been listed. Further, the World Health Organization has listed amiodarone in its List of Essential Medicines. See www.who.int/ medicines/publications/essentialmedicines/EML2015_8-May-15.pdf.[10] Thus, for over 30 years,

---

[8] Marroquin argues that some courts within the Ninth Circuit are not applying Rule 9(b) to negligent misrepresentation claims. The Court will not follow these cases. The Ninth Circuit has held that all claims sounding in fraud or grounded in fraud must meet Rule 9(b)'s heightened pleading requirement. See Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009). California courts have expressly held that "[c]auses of action for intentional and negligent misrepresentation sound in fraud . . . ." Daniels, 246 Cal.App.4th at 1166. Therefore, this Court will continue to apply Rule 9(b) to negligent misrepresentation claims. See Oushana v. Lowe's Home Ctrs., LLC, 2017 U.S. Dist. LEXIS 86042, *8-*9 (E.D. Cal. June 5, 2017).

[9] With respect to concealment, some courts have recognized that a plaintiff may not be able to plead a specific time and place, depending on the circumstances of the concealment. See Stewart v. Electrolux Home Prods., 304 F.Supp.3d 894, 906-07 (N.D. Cal. 2018). Nevertheless, Rule 9(b) still applies in such cases. See id. If alleging a precise time and location is not possible, then a plausible concealment claim should at least allege a time frame for the concealment and a description of the circumstances surrounding the concealment. Cf. id.

[10] The Court takes judicial notice that amiodarone is listed on the World Health Organization's List of Essential Medicines, as shown by the cited web address above. See Fed. R. Evid. 201(b)(2).

Cordarone/amiodarone has been used and viewed as beneficial by physicians and governmental entities for the treatment of certain cardiac conditions. Amiodarone/Cordarone's continued use since 1985 in the medical profession, despite the express warning about the potentially fatal side effect of lung toxicity, is contrary to the FAC's allegations that amiodarone is "not safe, fit, or effective."

Additionally, there are concerns with the element of reliance. Amiodarone would have been prescribed through Mrs. Marroquin's doctor. The factual allegations do not plausibly suggest that Mrs. Marroquin relied on anything other than her doctor's judgment and assessment that amiodarone was the proper medication for her at that time. If Mrs. Marroquin relied on her physician to prescribe the amiodarone while she was in the hospital, it is unclear how she could rely on any representations by Pfizer or Mylan.[11]

For these reasons, dismissal of the fifth, sixth, and seventh causes of action is appropriate.

### 6. Punitive Damages

Punitive damages are "merely an additional remedy that [are] dependent on a viable cause of action for an underlying tort." 569 E. County Blvd. LLC v. Backcountry Against the Dump, Inc., 6 Cal.App.5th 426, 430 n.3 (2016). Because there are no viable claims alleged, dismissal of the punitive damages request is appropriate.

### 7. Leave to Amend

Granting a party leave to amend is the general rule, even when a party does not expressly ask for leave to amend. See Ebner, 838 F.3d 958, 962. The Court has serious concerns whether amendment can cure the deficiencies identified in this order. For example, the allegations in the FAC and the judicially noticed documents indicate that there has been a sufficient warning regarding fatal lung toxicity, and it is likely that Mrs. Marroquin relied on her physician to prescribe an appropriate medication. However, the FAC contains mostly conclusory allegations, and the opposition does not address some of the key shortcomings in the FAC beyond requesting

---

[11] At least one court has found that *Carlin*'s analysis regarding warranty claims also applies to fraud claims. See Buckley v. DJO Surgical, 2012 U.S. Dist. LEXIS 146856, *12 (S.D. Cal. Oct. 3, 2012). In other words, like the duty to warn, any duty to disclose "true facts" runs to the physician. The parties have not adequately addressed this issue, so the Court simply raises the issue in the event that Marroquin files an amended complaint.

leave to amend or stating that the FAC is adequately pled. Given the state of the briefing, and the express request to file an amended complaint, the Court cannot determine at this time that amendment would be futile. Therefore, the Court will dismiss the FAC with leave to amend.

## II.   MYLAN'S MOTION

### Defendant's Arguments

Mylan makes essentially the same arguments as Pfizer with respect to the adequacy of the FAC's allegations under Rules 8 and 9(b). Additionally, Mylan argues that the gist of the FAC is a failure to provide adequate warnings. However, application of *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) and *Mutual Pharm. Co. v. Bartlett*, 570 U.S. 472 (2013) show that the FAC's claims are preempted by federal law. These cases explain that generic drug manufactures (such as Mylan) are required to provide a label for their generic drugs that exactly match the FDA label approved for the name brand drug. The FAC's warning based claims would require adding new or different information than that provided by the labels, and thus, are preempted. Under these circumstances, Mylan argues that dismissal should be with prejudice.

### Plaintiff's Opposition

Marroquin argues that only the fourth cause of action alleges a failure to warn theory, thus, *PLIVA* and *Mutual Pharm.* have no application to the other six causes of action. Further, the FAC can be amended to include allegations that Mylan is "also or either" a distributor of amiodarone. Marroquin argues that courts have declined to extend the preemption doctrine to the distributors of a generic drug like amiodarone.

### Discussion

#### 1.   Pleading Requirements

In terms of the requirements of Rule 8 and Rule 9(b), the analysis under Pfizer's motion applies equally to Mylan's motion. Therefore, for the same reasons described above, there are no plausible claims against Mylan and dismissal of all claims is appropriate.

#### 2.   Federal Preemption

Under federal law, generic prescription drug manufacturers may obtain FDA approval to

market their generic prescription drugs by demonstrating that their drugs are equivalent to a previously authorized name-brand version of the drug in three aspects: chemical formulation (including route of administration, dosage, and strength), bioequivalency, and labeling. See 21 U.S.C. § 355(j); Mutual Pharm. Co. v. Bartlett, 570 U.S. 472, 477 (2013); In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II), 751 F.3d 150, 153 (3d Cir. 2014); Drager v. PLIVA USA, Inc., 741 F.3d 470, 476 (4th Cir. 2014). Once the FDA has approved a generic prescription drug, the generic drug manufacturer may not make major changes to the qualitative or quantitative formulation of the drug, and may not unilaterally make changes to the drug's warning label. Bartlett, 570 U.S. at 477; see also Yates v. Ortho-Mcneil-Janssen Pharm., Inc., 808 F.3d 281, 296 (6th Cir. 2015). If a brand-name prescription drug manufacturer changes its label for a drug, then the generic drug manufacturer must also change its label to match the brand-name prescription drug's label because the generic manufacturer has an ongoing federal duty of "sameness" to match the brand-name drug label at all times. See PLIVA, Inc. v. Mensing, 564 U.S. 564, 613 (2011). Any state law that would require a manufacturer to change the formulation or labeling of an FDA approved generic prescription drug, so that it would no longer be identical to the formulation and label of the corresponding name-brand drug, will violate the federal duty of "sameness" and be preempted. Bartlett, 570 U.S. at 471, 483-84; Mensing, 564 U.S. at 618; Drager, 741 F.3d at 476. Additionally, by operation of "impossibility preemption," a generic drug manufacturer that complies with the duty of "sameness" is not required to exit the market/stop selling its drug in order to avoid tort liability for an inadequate warning or design. Bartlett, 570 U.S. at 488-90; Drager, 741 F.3d at 476. State law may be preempted when it is impossible for an individual to comply with both state and federal requirements. Mensing, 564 U.S. at 618. "Impossibility" is determined by asking "whether the private party could independently do under federal law what state law requires it to do." Id. at 620.

### a.   Fourth Cause of Action

The FAC does not allege that Mylan violated the duty of sameness with respect to its warning label for amiodarone. Further, Marroquin's opposition does not suggest that the warning label for amiodarone is different from the label of Cordarone. Instead, Marroquin argues that

preemption will not apply because he can allege that Mylan was a distributor and *Bartlett* and *Mensing* apply only to manufacturers. The Court is not convinced.

Marroquin is correct that some courts have noted a distinction between manufacturers and distributors for purposes of *Bartlett* and *Mensing*. However, context is key. The case cited by Marroquin, *Hatherley v. Pfizer, Inc.*, 2013 U.S. Dist. LEXIS 93943 (E.D. Cal. July 3, 2013), involved a motion to remand based on fraudulent joinder. See Hatherley, 2013 U.S. Dist. LEXIS 93943 at *2-*4. There is a general presumption against fraudulent joinder, and the fraudulent joinder doctrine will not apply "if there is a possibility that a state court would find that the complaint states a cause of action" against the allegedly fraudulently joined defendant. Grancare, LLC v. Thrower, 889 F.3d 543, 548 (9th Cir. 2018). Further, all doubts in the context of a removed case are resolved in favor of remand. See Geographic Expeditions, Inc. v. Estate of Lhotka, 599 F.3d 1102, 1107 (9th Cir. 2010). *Hatherley* (and other cases like it) found that because no binding authority had extended *Mensing* and *Bartlett* to cover distributors, it was not obvious that preemption would defeat a strict liability state law claim. See id. at *18-*20. *Hatherley* concluded that the fraudulent joinder doctrine did not apply as to the distributor defendant and the case was remanded for lack of subject matter jurisdiction. See id. at *27. Therefore, *Hatherley* did not have to answer the question of whether preemption should be extended to distributors. The court in *Hatherley* merely had to determine whether a claim could *possibly* be alleged against the defendant distributor in light of no binding authority regarding *Mensing*'s application to distributors.

Outside of the context of fraudulent joinder and removal/remand, courts have extended *Mensing* to entities that merely distribute prescription drugs, be they generic prescription or brand-name prescription drugs. See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig., 2016 U.S. Dist. LEXIS 187329, *605 (D. S.C. Nov. , 2016); Brazil v. Janssen Research & Dev. LLC, 196 F.Supp.3d 1351, 1364–65 (N.D. Ga. 2016); In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig., 2014 U.S. Dist. LEXIS 56862, *20-*21 (S.D. Ill. Apr. 24, 2014); In re Darvocet, Darvon & Propoxyphene Prod. Liab. Litig., 2012 U.S. Dist. LEXIS 89994, *37-*39 (E.D. Ky. June 22, 2012); In re Fosamax (Alendronate Sodium)

Products Liab. Litig. (No. II), 2012 U.S. Dist. LEXIS 5817, *27-*28 (D. N.J. Jan. 17, 2012). These cases recognize that mere distributors lack the ability to make any changes to an FDA approved label, rather only the holder of a New Drug Application (NDA) or the FDA itself can make any change to an FDA approved prescription drug label. E.g. In re Yasmin, 2014 U.S. Dist. LEXIS 56862 at *20-*21; In re Fosamax, 2012 WL 181411 at *27-*28. In this respect, a mere distributor sits in the same shoes as a generic manufacturer, neither has the ability to alter or change an approved FDA warning label. Additionally, in *Mensing*, the Supreme Court accepted the FDA's position that if generic drug manufacturers were permitted to alter labeling, including sending "dear doctor" letters with additional information or warnings, "that would inaccurately imply a therapeutic difference between the brand and generic drugs and thus could be impermissibly misleading." Mensing, 564 U.S. at 615; Brinkley v. Pfizer, Inc., 772 F.3d 1133, 1135 (8th Cir. 2014). The risk of confusion or being misled by a different or perhaps even conflicting "label" would seem to be greater if a mere distributor could add additional warnings that it deems necessary or advisable. Because of the danger of "confusion," and because the Court is unaware of a federally lawful way for a mere prescription drug distributor to include its own warnings or otherwise alter an FDA approved label, the Court agrees with those courts that hold *Mensing* applies to distributors of prescription drugs, be they brand-name or generic.

Therefore, Marroquin's request to add an allegation that Mylan was a distributor does not save the fourth cause of action. By application of *Mensing*, amendment of the fourth cause of action against Mylan will be denied as futile. See Garmon, 828 F.3d at 842.

### b. First Cause of Action

As discussed above, the Court reads the first cause of action as attempting to allege a manufacturing defect. A manufacturing defect has nothing to do with FDA required labels. Therefore, *Mensing* and "impossibility preemption" does not apply to the first cause of action.

### c. Remaining Claims

*Mensing* has been applied to state law claims for negligence, breach of warranty, and fraud. See Guarino v. Wyeth, 719 F.3d 1245, 1247, 1249 (11th Cir.2013) (holding that labeling various state law claims as "failure to communicate" instead of "failure to warn" did not change

the fact that the claims were "at bottom allegations regarding Teva's failure to warn of the dangers of long-term metodopramide use, and they therefore cannot escape *Mensing*'s grasp."); Utts, 251 F.Supp.3d at 660; In re Pamidronate Prod. Liab. Litig., 842 F. Supp. 2d 479, 484 (E.D.N.Y. 2012). It is likely that *Mensing* would apply to the second, third, fifth, sixth, and seventh causes of action. To the extent that these claims depend on Mylan providing or communicating a warning that differs from the FDA approved label for Cordarone, *Mensing* requires preemption and dismissal.

However, as discussed above, because of the conclusory nature of the FAC's allegations, it is not clear that amendment would be futile. The Court will grant Marroquin leave to amend the FAC, but any amendment must contain sufficient factual allegations that demonstrate *Mensing* does not apply.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. Pfizer's motion to dismiss (Doc. No. 19) and Mylan's motion to dismiss (Doc. No. 18) are GRANTED;

2. Plaintiff may file an amended complaint that is consistent with this order no later than twenty-one (21) days from service of this order;[12]

3. Defendants shall file a response to Plaintiff's amended complaint within fourteen (14) days of service of the amended complaint; and

4. The failure of Plaintiff to file a timely amended complaint will result in the withdrawal of leave to amend and the closure of this case without further notice.

IT IS SO ORDERED.

Dated:   February 14, 2019                      _____

                                         SENIOR  DISTRICT  JUDGE

---

[12] The fourth cause of action (strict liability for failure to warn) against Mylan is dismissed with prejudice.